```
1              IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
2                     EASTERN DIVISION

3
 UNITED STATES OF AMERICA,        )
4                                 )
                   Plaintiff,     )
5                                 )
                                  )
6  -vs-                           )  Case No. 19 CR 900
                                  )
7                                 )  Chicago, Illinois
   KENTRELL BROWN,                )  January 25, 2021
8                                 )  3:00 p.m.
                   Defendant.     )
9

10                 TRANSCRIPT OF PROCEEDINGS
              VIA VIDEOCONFERENCE - Sentencing
11          BEFORE THE HONORABLE JOHN J. THARP, JR.

12  APPEARANCES:

13  For the Plaintiff:    UNITED STATES ATTORNEY'S OFFICE
                          BY:  MR. SHAWN DANIEL McCARTHY
14                        219 S. Dearborn Street
                          Suite 500
15                        Chicago, IL  60604

16  For the Defendant:    FEDERAL DEFENDER PROGRAM
                          BY:  MR. GEOFFREY McDONNELL MEYER
17                        55 E. Monroe Street
                          Suite 2800
18                        Chicago, IL  60603

19

20

21

22
    Court Reporter:       KELLY M. FITZGERALD, CSR, RMR, CRR
23                        Official Court Reporter
                          United States District Court
24                        219 South Dearborn Street, Room 1420
                          Chicago, Illinois  60604
25                        Telephone:  (312) 818-6626
                          kmftranscripts@gmail.com
```

1      (Proceedings heard via videoconference:)

2           THE COURT:  All right.  Good afternoon, everyone.

3  This is Judge Tharp.  Can everyone hear me?

4           MR. McCARTHY:  Yes, Your Honor.

5           MR. MEYER:  Yes, Judge.

6           THE COURT:  All right.  Are we prepared to go forward

7  with our sentencing hearing?

8           MR. McCARTHY:  Yes, Your Honor.  The government is

9  ready.

10          THE COURT:  All right.  It looks we may have just

11 lost Mr. Meyer.  There we go.

12          Okay.  This is United States v. Kentrell Brown, 19 CR

13 900.

14          Will government counsel put your appearance on the

15 record, please.

16          MR. McCARTHY:  Good afternoon, Your Honor.  Shawn

17 McCarthy on behalf of the United States.

18          THE COURT:  All right.

19          And counsel for Mr. Brown?

20          We seem to have lost Mr. Meyer.  Mr. Meyer, can you

21 hear me?  If you can hear me, we're not seeing or hearing you,

22 but you're still listed as a participant.

23          Mr. Meyer, can you hear us?

24          MR. MEYER:  Yes, Judge, I can hear you.

25          THE COURT:  There you go.  We lost you for about

1     three minutes there.

2              MR. MEYER:  Sorry about that.

3              THE COURT:  You want to put your appearance on the

4     record?

5              MR. MEYER:  Good afternoon, Judge.  Geoffrey Meyer

6     from the Federal Defender Program on behalf of Mr. Brown.

7              THE COURT:  All right.

8              And our probation officer, Ms. Fowlie?

9              PROBATION OFFICER:  Yes.  Good afternoon, Your Honor.

10    Rebecca Fowlie on behalf of the probation department.

11             THE COURT:  All right.

12             This is a videoconference sentencing hearing, and I

13    just want to confirm before we go any further, Mr. Meyer, that

14    you have discussed the issue of proceeding by video versus

15    in-person hearing and the defendant is waiving his right to be

16    sentenced in an in-person, in-court hearing; is that correct?

17             MR. MEYER:  Yes, Judge, that is correct.

18             THE COURT:  All right.

19             Mr. Brown, would you raise your right hand, please.

20             Do you swear or affirm that all the statements that

21    you make in the course of this sentencing hearing will be the

22    truth, the whole truth, and nothing but the truth?

23             You may be on mute, Mr. Brown.  Sorry.  We can't hear

24    you.

25             THE DEFENDANT:  Could you hear me now?

1            THE COURT:  Now we can hear you.

2            THE DEFENDANT:  Yeah, it was on mute.

3            THE COURT:  Okay.

4       All right.  I want to make sure that --

5            THE CLERK:  Excuse me, Judge.

6            THE COURT:  Yes, Alberta?

7            THE CLERK:  I did not hear him say "I do."

8            THE COURT:  All right.  We'll do that one more time

9  since we were interrupted, Mr. Brown.

10           Do you swear or affirm that all the statements that

11 you make in the course of this hearing will be the truth, the

12 whole truth, and nothing but the truth?

13           THE DEFENDANT:  Yes.

14           THE COURT:  All right.  I'm going to ask you -- we're

15 getting a lot of feedback.  I'm going to ask you to go back on

16 mute unless you are going to be speaking; all right?

17           THE DEFENDANT:  Okay.

18           THE COURT:  All right.  I want to make sure that I

19 have reviewed everything that's been submitted for this

20 hearing.

21           In addition to reviewing the plea declaration and the

22 presentence investigation report, I have reviewed the

23 probation office's sentencing recommendation, the government's

24 version of the offense, the government's sentencing

25 memorandum, the defendant's sentencing memorandum, the

1    defendant's response to the government's memorandum and a
2    collection of four letters of support submitted on behalf of
3    Mr. Brown.
4            Is there any other material that was submitted that I
5    have not referenced?
6            MR. MEYER:  Not on behalf of the defense.
7            MR. McCARTHY:  Not on behalf of the government,
8    Your Honor.
9            THE COURT:  All right.  Is either party intending to
10   make any evidentiary presentation today?
11           MR. McCARTHY:  Not on behalf of the government,
12   Your Honor.
13           THE COURT:  Mr. Meyer?
14           MR. MEYER:  Not on behalf of the defense, Judge, but,
15   Judge, if I could interrupt for just a moment.  I apologize.
16   I'm having some connection issues.  With the Court's
17   permission, I'm going to dial in by telephone and mute my
18   video.
19           THE COURT:  All right.  That's fine.
20           MR. MEYER:  Thank you.
21           This is Geoffrey Meyer.  Are you able to hear me?
22           THE COURT:  We could hear you.  We could also still
23   see you.
24           MR. MEYER:  Okay.  Then I believe we're ready to
25   proceed.

6

1      THE COURT:  All right.  Okay.  I'm sorry.  Everything

2  that's been submitted, let's turn to the presentence

3  investigation report.

4      Two aspects of that report.  First, were there any

5  objections to the facts set forth in the PSR?  I don't believe

6  either party identified any factual errors, but, Mr. Meyer,

7  any factual corrections to the PSR from the defense?

8      MR. MEYER:  There are none from the defense, Judge.

9      THE COURT:  All right.

10      Mr. McCarthy?

11      MR. McCARTHY:  None on behalf of the government,

12  Your Honor.

13      If I may interrupt for just one moment.  Do we still

14  have the defendant?  My monitor shows that he --

15      THE COURT:  Thank you.  I missed that.

16      Mr. Brown, are you still with us?

17      THE DEFENDANT:  Yes.  Yes, I'm here.

18      THE COURT:  Could you let the correctional officer

19  know that we don't have you on video?

20      THE DEFENDANT:  All right.

21      THE COURT:  We could see you.  Can you hear us?

22      THE DEFENDANT:  Yes.

23      THE COURT:  Moving right ahead, there were no factual

24  objections to the PSR.  Let's turn to the calculation of the

25  advisory sentencing guideline range.

```
 1              Mr. Meyer, I understand the defense -- my
 2    understanding is the defense does not object to the
 3    calculation, but you have arguments that the criminal history
 4    category is effectively overstated due to the juvenile
 5    convictions.
 6              MR. MEYER:  That's correct, Judge.  That's our
 7    position.
 8              THE COURT:  Okay.
 9              And the government had no objections to the
10    calculation of the guideline range, Mr. McCarthy?
11              MR. McCARTHY:  No, Your Honor.
12              THE COURT:  All right.  So there are no objections to
13    the accuracy of the calculation of the guideline range set
14    forth in the presentence investigation report.  I'm not going
15    to reiterate that calculation.  The bottom line of that
16    calculation is that the final offense level is 12, criminal
17    history category is VI.  And the combination of criminal
18    history category VI and offense level of 12 yields an advisory
19    sentencing guideline range of 30 to 37 months, a supervised
20    release range of one to three years and a fine range of $5,500
21    to $55,000.
22              Any other issues with respect to the calculation of
23    the advisory guideline range?
24              MR. MEYER:  Not from the defendant.
25              MR. McCARTHY:  None from the government.
```

1          THE COURT:  Okay.  Then we'll turn to consideration

2    of all of the factors, including the advisory sentencing

3    guideline range that the Court is required to take into

4    account in determining the appropriate sentence to impose in

5    this case.

6          I'll hear first from Mr. McCarthy on behalf of the

7    government, then Mr. Meyer on behalf of Mr. Brown.

8          And, Mr. Brown, once your attorney has made his

9    arguments on your behalf, you have the right to address the

10   Court yourself if you wish to do so.  You're not required to

11   do so.  If you choose not to do so, that will not be held

12   against you, but you will have that opportunity once Mr. Meyer

13   has -- or Mr. Meyer has made all his arguments; all right?

14         THE DEFENDANT:  Yes.

15         THE COURT:  Okay.  All right.

16         Mr. McCarthy.

17         THE COURT REPORTER:  Judge, could we please put

18   Mr. Brown back on mute to eliminate some of the feedback?

19   Thank you.

20         THE COURT:  Yes.

21         Mr. Brown, we've got you on mute again, but I'll

22   unmute you if you need to say anything.

23         All right.  Mr. McCarthy.

24         MR. McCARTHY:  Thank you, Your Honor.

25         Your Honor, this defendant is a relatively young

1   offender.  However, he is not a new offender.  This defendant

2   has a history of committing crimes.  When evaluating this

3   defendant's criminal history, at merely the age of 23, it's

4   astonishing that he has had so many weapons offenses, a couple

5   of which is weapons offenses, as Your Honor I'm sure viewed in

6   the exhibits attached to the government's memorandum, this

7   defendant simply always has a firearm.  He doesn't just have a

8   firearm.  He brandishes firearms.  He flashes firearms.

9           And in this case, Your Honor, what's most disturbing

10  is this defendant brought his own firearm to a range.  Knowing

11  that he was a convicted felon, this defendant still felt

12  comfortable enough, still had the audacity and the nerve to

13  bring a gun into a firing range.  He had been convicted of gun

14  crimes before.  He knew he could not have a firearm, yet he

15  brings his own gun into the firearm [verbatim].  He uses

16  another person to purchase ammunition.

17          The defendant is so brazen and so disrespectful and

18  has such little regard for the law, he used his social media

19  to broadcast himself, broadcast himself violating the law,

20  broadcast him self committing felonies, and he talks about it

21  on social media.  He goes into detail on how he is going to

22  load the gun with the ammunition and how he fires the weapon.

23  He even describes on there what kind of gun he's using.  And

24  even more disturbing than that, Your Honor, he brings back the

25  target after having fired the nine bullets that he said he was

1    going to put into the gun, he counts out what he describes as

2    "head shots," all of this being broadcast on social media for

3    the whole world to see, all of it for this defendant to show

4    he has no regard for the law.  This defendant has no regard

5    for safety, no regard for rules, all this at such a young age.

6    He knows better, Your Honor.

7          When you look at the videos that were submitted, the

8    exhibits that were submitted to the government's sentencing

9    memorandum, in the one video where the defendant is sitting in

10   what appears to be a bedroom with many other individuals

11   smoking some sort of substance, the defendant at various times

12   holding two guns, pointing them at the camera, oftentimes

13   holding one of the guns upside down.

14         If it weren't enough that the defendant is a

15   convicted felon having a gun, the defendant handles the guns

16   in a completely reckless manner.  The defendant while holding

17   these guns in this room even says, "I have court tomorrow."

18   The defendant knows he is under the Court's eye, yet he still

19   broadcasts to the world through social media, through Facebook

20   Live, his utter disregard.

21         This defendant has been given chances, Your Honor,

22   and each time this defendant thumbs his nose and continually

23   breaks the law.

24         The defendant has criminal convictions for firearms

25   offenses, yet he continues to possess firearms.  The defendant

1   has not learned from prior sentences that took into

2   consideration his young age.  At this point, Your Honor, a

3   sentence needs to grab this defendant's attention to let him

4   know while he may be young, he is not a child.  He does and

5   should know better.  And only a sentence that will express

6   that he is no longer a child and there are real ramifications

7   for his actions, his willful actions, his choices to disregard

8   and violate the law will be appropriate.

9            Our community is plagued with gun violence.  There

10  are guns all over the streets of Chicago, all over Cook

11  County, all over the Northern District of Illinois.

12  Repeatedly we see this defendant with multiple firearms,

13  brandishing those firearms, showing those firearms off.  It's

14  only a matter of time that this defendant continues this way

15  before one of those firearms is going to be used in a manner

16  in which a life will be lost.  A sentence needs to be imposed

17  to get that message across not only to this defendant but to

18  the community at large that illegal firearms are a problem.

19  Illegal firearms will be addressed by the Court in a manner in

20  which keeps all of us safe.

21           For those reasons, Your Honor, and those argued in

22  the government's version as well as in the government's

23  sentencing memorandum, coupled with the exhibits that were

24  provided to Your Honor, the government would ask that

25  Your Honor sentence this defendant to a term within the

1    guidelines range.

2            THE COURT:  All right.

3            MR. McCARTHY:  Including --

4            THE COURT:  Go ahead.  Sorry.

5            MR. McCARTHY:  As well as supervised release of three

6    years, Your Honor.  Thank you.

7            THE COURT:  All right.  Thank you, Mr. McCarthy.

8            Mr. Meyer.

9            MR. MEYER:  Thank you, Judge.

10           The government might see this case very differently

11   in many respects.  The government sees someone who is showing

12   utter disregard for the law and for court orders.  I see

13   someone who is very immature.

14           The government sees someone who has been given

15   chances in the past by the criminal justice system.  I see

16   someone who exemplifies many of the failures of the overworked

17   Cook County juvenile justice system and its inability to

18   provide support to the people who come through the system.

19           The government believes that a sentence imposed today

20   needs to grab Mr. Brown's attention.  And while in some

21   respects that may be true, I think it's hard to look at a

22   person in Mr. Brown's situation, someone who has been

23   incarcerated over the last it's going on 14 months I believe

24   now in a county Jail in the middle of a global pandemic and

25   not recognize that that person has had their attention

1   grabbed.  This sentence that he's been serving at the

2   Kendall County Jail is not only the longest sentence that he's

3   served in his life, it's certainly the most severe and,

4   frankly, the most frightening.

5        I recognize the importance of the videos that the

6   government provided to you, and I think they are kind of at

7   the crux of what sentence is appropriate to impose in this

8   case, but, again, I view them very differently than the

9   government.  You know, taking out the firearm from the video

10  that appears to be in the bedroom, the Facebook Live stream in

11  the bedroom, you've got a group of teenage or just barely in

12  their twenties young men who are horsing around in many of the

13  same ways that we expect teenagers to horse around in.  You

14  know, they're listening to music.  They're singing along with

15  the television.  They're playing video games.  They're

16  engaging in horseplay amongst themselves.  Now, I recognize

17  that you can't take out the firearms in that video, that there

18  are firearms there, and that is certainly concerning.

19       And I want to make clear that we're not asking in the

20  sentence that we propose that the Court excuse Mr. Brown's

21  conduct altogether.  He recognizes that he violated the law.

22  He recognizes that he's done wrong and he needs to be

23  punished.  What we're proposing is a punishment that we

24  believe is more commensurate with his mindset and his maturity

25  at the time that these offenses and his prior offenses were

1   committed.

2        I looked at a lot of the electronic evidence in this

3   case, and I have to be frank.  You know, my first reaction

4   when I see that Mr. Brown is broadcasting on Facebook Live his

5   time at the shooting range, one, the government is correct.

6   He knows that he's not permitted to possess a firearm.  I look

7   at that, and I think to myself, how could that have happened?

8   That's so stupid, for lack of a better word.  And I want to be

9   clear, I'm not calling Mr. Brown stupid.  I think the action

10  is stupid.  Mr. Brown, when I talk to him and as I've gotten

11  to know him over the course of the last a little more than a

12  year actually is a very intelligent person.  So I think some

13  of the struggle that I've had is reconciling what happened in

14  these videos and the intelligent young man that I've gotten to

15  know.  And where I'm left is maturity and the level of

16  maturity that Mr. Brown has shown and frankly the level of

17  maturity we're starting to understand as we look into the

18  science more that goes along with brain development and how,

19  you know, even though we've chosen 18 as an age -- a cutoff

20  age for people to transition from childhood into adulthood,

21  that we're starting to realize that just because we've chosen

22  that date doesn't mean that the brain develops that way.

23        And I think this case is actually a really powerful

24  example of that.  I think it speaks to many of the themes that

25  the Supreme Court has returned to repeatedly when discussing

1   juveniles and youth: recklessness, impulsivity, risk taking,

2   the fact that youths are more vulnerable to negative

3   influences and outside pressures, transient rashness,

4   proclivity for risk, inability to assess consequences.  I

5   think those are on full display in this case and in those

6   videos.

7         Now, this doesn't absolve Mr. Brown of

8   responsibility.  He recognizes that, and I recognize that.

9   But I think it does speak to what is the appropriate sentence

10   of imprisonment to impose on him because it goes to his

11   mindset, and it goes to what he was doing with those firearms.

12   He wasn't using the firearms to commit other crime, to commit

13   violent crime.  In some respects, I think they are defensive.

14   Mr. Brown, even though he is very young, has already been the

15   victim of gun violence, so he's well familiar that communities

16   in the Chicagoland area are plagued by gun violence.  He knows

17   that because he's twice been a victim.  And it is not uncommon

18   for us to see particularly younger people carry and carry

19   openly in a defensive manner to protect from being a victim of

20   gun violence again.  It might not make sense to those of us

21   who didn't grow up in those communities, but it is certainly

22   something that I see in my practice again and again.

23         And then another aspect of this case in particular

24   that doesn't necessarily come up in my general practice is

25   Mr. Brown was an aspiring artist.  And to be clear, I'm not

1    arguing that this excuses his conduct.  But I think
2    particularly the second letter that we provided to the Court
3    in our response to the government's sentencing memo goes a
4    long way in explaining the online persona that Mr. Brown was
5    attempting to put forth and frankly was successfully gaining
6    him an online social media presence.  One of the videos that
7    the government submitted to you as an Instagram Live, which I
8    think is where the government took it, is actually a
9    well-produced rap video of one of Mr. Brown's songs.  And as
10   he explains in his letter, this was the way he thought he had
11   to break into the industry.

12           Now, he knows today that that's not the case and he
13   can't do that going forward because he's lived the reason he
14   can't for the last, you know, 13, 14 months.  It landed him in
15   the Kendall County Jail in the middle of a pandemic.  He lost
16   two family members while he was incarcerated and was unable to
17   attend the funeral services, two of his older brothers that he
18   was very close with, and that was a very, very difficult thing
19   for him to do, or not to be able to do.

20           So he has had a great deal of time to think about
21   what he needs to mature, what he needs to do in the future in
22   order to remain out of the criminal justice system and remain
23   with his family, which frankly has been the hardest part for
24   him since he's been at the Kendall County Jail, is being away
25   from his family.

1          So I think in his two letters to the Court that we've

2    submitted, he's shown a great deal of self-reflection and a

3    great deal of looking forward and making plans.  He started

4    the GED classes when he could in Kendall County.  He certainly

5    intends to continue with those when he's out.  And he also has

6    been in contact with his former employer to make sure that he

7    has a job waiting for him when he is released.  And he does

8    have a supportive family to return to.

9          So we believe that looking at his age, looking at his

10   maturity level and looking at how overstated that criminal

11   history score is in the guidelines that the original

12   guidelines that we and the government had contemplated when he

13   pleaded guilty are more appropriate for the Court as the

14   starting point here.  We are asking the Court to vary below

15   those guidelines range down to 18 months and instead swap in a

16   six-month period of home incarceration.  And that particular

17   swap is in recognition of two things: one, the pandemic; and,

18   two, that Mr. Brown, as a young person who is still developing

19   and still maturing, could really benefit from the far greater

20   resources of the federal U.S. Probation Office and that six

21   months of home incarceration with contact with a probation

22   officer will be far more rehabilitative for him than six

23   months in the Bureau of Prisons which is likely to remain on

24   lockdown, you know, for the better part of the next year is

25   everyone's best guess.

1    So that's how we came up with the sentence that we're

2    proposing to the Court, and we believe, based on the

3    circumstances of this case and for the reasons I've talked

4    about today and the reasons we purport in our submissions to

5    the Court, that 18 months of incarceration with six months of

6    home incarceration to follow with a total of three years of

7    supervised release is the appropriate sentence to impose

8    today.

9         THE COURT:  All right.  Thank you, Mr. Meyer.

10        All right.  Mr. Brown, this is your opportunity if

11   you wish to address the Court directly.  Again, you have that

12   opportunity, but you're not required to say anything at all.

13   If you do say anything, it will be considered by the Court in

14   assessing the appropriate sentence to impose.

15        Do you wish to address the Court?

16        THE DEFENDANT:  Yeah.  Could you hear me?

17        THE COURT:  Yes, I can.  Thank you.

18        THE DEFENDANT:  Yeah.  I just wanted to say that I

19   just feel like being down here, I just really found better

20   things to do and that I was immature when I was out there

21   doing a lot of things that I shouldn't have had no business

22   doing.  And I just feel like I gained a lot from being down

23   here.

24        THE COURT:  Okay.  Anything else?

25        THE DEFENDANT:  No, not really.  I think I covered

1    everything in my letter.

2           THE COURT:  Okay.  And I did read your letter.  Thank

3    you.

4           Okay.  Under Title 18 of the United States Code,

5    Section 3553(a), I am required to impose a sentence that is

6    sufficient but not greater than necessary to promote the

7    various objectives of sentencing that are set forth in that

8    statute.  Those purposes include the need for the sentence

9    imposed to reflect the seriousness of the offense, to promote

10   respect for the law and to provide just punishment for the

11   offense, to afford adequate deterrence to criminal conduct, to

12   protect the public from further crimes of the defendant and to

13   provide the defendant with needed educational or vocational

14   training, medical care or other correctional treatment in the

15   most effective manner.

16          To try to arrive at a sentence that will promote

17   those objectives, the Court must consider the nature and

18   circumstances of the offense and the history and

19   characteristics of the defendant.  There are other factors the

20   Court must take into account as well, such as the kinds of

21   sentences available under the law, which is a category that

22   includes consideration of the advisory sentencing guideline

23   range.  The Court is also required to consider the need to

24   avoid unwarranted sentencing disparities among defendants who

25   have similar records and who have been found guilty of similar

1   conduct, and other factors such as restitution that are not at

2   issue here.

3          Many of the facts and circumstances that bear on

4   these considerations are overlapping in that they may be

5   relevant to more than one objective, and sometimes the facts

6   that are relevant point in different directions in terms of

7   what they suggest the appropriate sentence in the case should

8   be.  It's the Court's task to take into account all of those

9   circumstances in determining a sentence that is, again,

10  sufficient but not necessary -- sufficient but not greater

11  than necessary to promote the sentencing objectives.

12         I'm going to discuss some of the points that have

13  been made here and the factors that bear on the Court's

14  consideration of the appropriate sentence to impose here.  I

15  start first with the seriousness of the offense.

16    (Brief interruption.)

17         THE COURT:  Excuse me.  For some reason my cell phone

18  is going off.

19         The charge here that Mr. Brown has been found guilty

20  of is unlawful possession of ammunition by a previously

21  convicted felon.  In its base form, that is a serious offense

22  for the simple reason that firearms and felons are a very

23  volatile and dangerous combination.  Firearms, of course, are

24  lethal weapons.  There's no real point here in distinguishing

25  between ammunition and firearms.  The ammunition is useless

1  without a firearm.  The firearm is just about useless without

2  the ammunition.  They go hand in glove.

3          The reason that we don't let people who have been

4  convicted of felonies possess firearms is because those people

5  have demonstrated that they don't have the judgment or the

6  capacity or the willingness to conform their conduct with the

7  law.  And the idea of putting something that -- a moment's

8  poor judgment and inflict the kind of damage that a firearm

9  can inflict makes any combination of felons and firearms

10  dangerous, and that's why this crime exists.

11          Of course in this case there are a number of factors

12  that make this significantly more serious than just the base

13  level generic offense of possessing ammunition as a firearm --

14  as a felon.  While that's the charge, the clear conduct here

15  involves more than the possession of ammunition.  It involves

16  the possession of a firearm.  I share Mr. McCarthy's concern

17  that, you know, this -- I've had other gun range felon in

18  possession cases where the defendant went to the gun range

19  with somebody with a FOID card and a gun was rented, was used

20  at the range and turned in, and the defendant left.  That's a

21  situation that I have found presents, you know, less

22  culpability than most situations where there is possession of

23  a firearm.  But that's not the situation here.  Mr. Brown had

24  his own firearm to bring to the range, bought lots of ammo at

25  the range -- that's the basis of the offense that's been

1    charged -- and took some of that ammo with him and the firearm

2    from the range.  And there's only one real reason that you

3    need ammunition, and that's to load a firearm.  And we see in

4    the video the kind of conduct I guess -- you can't see for

5    sure if those many different firearms that Mr. Brown is seen

6    in possession of on these videos, don't know if they're

7    loaded, but they certainly got -- most of them have magazines,

8    and many of those magazines are extended magazines.  So it's a

9    fair inference that Mr. Brown is buying ammunition, taking it

10   from the gun range to load the firearm or firearms that he is

11   frequently, if not constantly, as Mr. McCarthy has suggested,

12   in possession of.  And whether you think you're carrying a

13   firearm around as a defensive mechanism or offensive, I'm

14   sure, you know, the other side in every shootout has said we

15   were on the defensive.  We were just trying to protect

16   ourselves.  Nobody ever says, oh, yeah, we were out there to

17   stir up trouble.  We were out there to attack people without

18   any provocation.  Everybody out there in every shootout, in

19   every gang shooting, is out there claiming to need to protect

20   themselves.  The real people that need to protect themselves

21   are the little kids who get shot in their backyard or even get

22   shot in their living rooms, inside their houses, on front

23   porches because gang members are going around armed to the

24   teeth to retaliate and protect themselves.

25            Mr. Brown, what you're calling protection is what's

1    endangering the public today.  I don't know if you were out

2    ever driving around cruising the streets with those firearms,

3    but I've got no reason to think they were just props in a

4    music video.  Firearms aren't free, even on the street.  And I

5    stopped trying to count the number of different firearms that

6    you're depicted in these videos and photographs as being in

7    possession of.  And I don't know where these videos are coming

8    from.  But it's not coming from your work, your temporary work

9    as a -- at a restaurant.  So there is all kinds of aggravation

10   here.  When I see those videos, I see someone thumbing their

11   nose at the law, showing absolute and utter disrespect,

12   committing crimes, broadcasting those crimes to your friends

13   and cohorts while you're on court supervision, and that is the

14   very definition of factors in aggravation.  And the sentence

15   that is imposed in this case has to take those aggravating

16   factors into account.

17           There are some factors in mitigation with respect to

18   this offense.  For whatever reason, the offense of conviction

19   is based on your conduct at a gun range.  As I've said, in the

20   spectrum of things that people do, felons do with firearms,

21   being at a gun range is at least a less serious form of crime

22   in its generic sense, so I take that into some account.  But

23   for the reasons that I've already indicated, it's not really a

24   ripe comparison to say -- to compare this with a felon who

25   just shows up for some target practice, rents a gun, turns it

1    in and leaves, carrying neither a weapon nor ammunition with

2    him.

3          And the biggest mitigating factor here is luck, luck

4    that this is a nonviolent offense, luck that on some occasion

5    when you possessed all those firearms with extended magazines

6    that somebody didn't take offense to your message or seek to

7    retaliate against you for something that somebody else did or

8    just decide all that cash and those weapons was too enticing a

9    target.  I mean, there's countless things that can go wrong

10   when you're possessing loaded firearms in the company of other

11   young, immature males who are possessing loaded firearms.

12   It's a recipe for disaster.

13          I won't continue to beat this drum too much, but as

14   we transition into consideration of Mr. Brown's history and

15   characteristics, of course we have to start with criminal

16   record.

17          Mr. Brown, I have to say I think Mr. Meyer is right

18   when he wrote in his sentencing memorandum he's never had a

19   client in all his years as a criminal defense lawyer who

20   managed to put himself in criminal history category VI without

21   ever spending more than a year in jail.  It's a dubious

22   accomplishment, but it's an accomplishment nonetheless.  And I

23   don't think I've ever -- I know I've never seen anyone with

24   the juvenile record that you've amassed.  And it's -- if

25   there's been one, I've forgotten.  I can't recall anybody ever

1   being in criminal category VI at the ripe age of 22.  So,

2   again, we have that dubious accomplishment to consider.

3          Mr. Meyer, I do understand your points with respect

4   to juvenile record, and your arguments about immaturity and

5   youthfulness certainly have the most force in the context of

6   15 year old and 16 year old Kentrell Brown.  They've got a lot

7   less force when we're talking about 22 year old Kentrell Brown

8   as we are in this case.  But I grant your point, and I do

9   agree as a result that the criminal history calculation really

10  does overstate Mr. Brown's record to some degree, and I will

11  take that into account.  As I also take into account the

12  recidivism that's reflected there, whether it's the product of

13  immaturity or just recalcitrance, it's still recidivism, and

14  it still has to be considered by the Court.  If this was a

15  case, if any sentencing of a defendant was only about the

16  defendant, the job of sentencing would be a lot simpler.  I

17  don't doubt that Mr. Brown would benefit from lots of close

18  supervision, access to services, treatment programs, mental

19  health programs, educational programs, job skills training,

20  all of that would absolutely be great for Mr. Brown, but it's

21  not all about Mr. Brown.  And for whatever reason Mr. Brown

22  didn't get those things, doesn't get those things as he comes

23  through the system, it may be unfortunate, but it's also the

24  reality that we have to deal with.  And part of what this

25  sentence has to reflect in this case or to achieve in this

1    case is to protect the public.  If Mr. Brown is too immature

2    or too abstinent or too recalcitrant or whatever the reason is

3    that he cannot or will not comport his conduct with the law,

4    we have to take that into account because part of what I have

5    to do here is ensure that the sentence is sufficient to

6    protect the public.

7            Mr. Brown has no high school diploma.  He's got no

8    significant job experience.  He's got no significant job

9    skills.

10           Mr. Brown, I don't mean that to denigrate whatever

11   musical talents you may have.  But I can tell you the vast

12   majority of defendants who come through this court all aspire

13   to be a rap star and it's really, really sad.  It's

14   particularly sad when I see somebody like yourself who has

15   himself been the product of violence, gun violence, who has

16   lost brothers to gun violence and then to hear that you're

17   putting -- and see that you're putting out videos glorifying

18   the culture that not only victimized you but victimized your

19   family members who you and your lawyer tell me you care more

20   about than anybody.  And that's what's most important to you,

21   family.  I can't even process that because I can't imagine the

22   reaction to losing two brothers to gun violence being to say,

23   hey, well, I know what I'm going to do.  I'm going to go and

24   create some rap videos that glorify the culture that killed my

25   brothers.  That's what you're doing.

1       It's not only hard to understand.  It's going to be

2  unproductive because if you continue to glorify this culture,

3  you're never going to make it to a recording studio.  You're

4  going to spend more and more time behind bars.  The sentence

5  imposed in this case is going to be already the longest

6  sentence you've ever served.  When you finish serving this

7  sentence, you get out and you go back to the same ways, you

8  touch a firearm, the next sentence is going to be even longer.

9  That's how it works.  And I don't think you have to be very

10  mature and certainly don't have to be a rocket scientist to

11  understand that basic premise.  If you don't get with the

12  program, the next time the message is louder.

13       The question of Mr. Brown's age, Mr. Meyer, really

14  cuts both ways.  I certainly acknowledge what you said about

15  studies that show that brain development continues well into

16  the twenties.  I guess I really already made this point.  The

17  flip side of that is it creates a greater risk of recidivism

18  among the young, and that's borne out by statistics as well.

19  Age correlates, and usually that's presented to me as an

20  argument why somebody who is aging out of crime, but here it's

21  the flip side of the argument you've made saying he's too

22  immature to be fully held accountable for his crime because

23  that same immaturity creates greater risk of recidivism and

24  greater risk of danger to the public, greater risk of

25  continued criminal activity.

1    Considering Mr. Brown's health, there's no

2  significant health issues that bear on the sentence to be

3  imposed or that mitigate the offense.  There is a record of

4  substantial prior substance abuse.  It's on display in some of

5  those videos.  And honestly, Mr. Brown, if we needed a public

6  health campaign to show the dangers of mixing guns and drugs,

7  the video of you in what I assume is your bedroom but

8  whoever's bedroom it was with about four or five of your

9  companions all smoking -- and Mr. McCarthy was being very

10 cautious and conservative in saying some substance.  There's

11 no doubt that was marijuana.  And at this point, under state

12 law, marijuana use isn't a crime under certain circumstances.

13 But there couldn't be a better illustration of the dangers of

14 making marijuana readily available because I have to think

15 part of -- it's not just immaturity that led you to create the

16 videos.  It's the poor judgment that follows by getting high.

17 And it's that poor judgment that, again, goes back to why it's

18 so dangerous for you to possess firearms and why it's -- you

19 know -- you know, you should be lucky -- I feel lucky and the

20 Chicago public should feel lucky that you didn't leave that

21 room, go out on the streets with your loaded guns while you

22 were high and put the public at risk.

23    I'm going to address a couple of comments that

24 Mr. Meyer made.

25    Mr. Meyer, respectfully, the characterization of

1   what -- the conduct on the videos as horsing around is so far

2   from reality that I can't give it any credence.  What's

3   depicted on those videos is not Mr. Brown horsing around.

4   It's Mr. Brown committing crimes knowingly, intentionally and

5   purposefully, willfully, almost celebrating the fact that he's

6   committing crimes.  That's not teenage horsing around, and I

7   cannot accept in any way, shape or form that characterization

8   of the conduct.

9           Actually, looking at my notes here, I think I've

10  addressed most of the points.  The last point I wanted to

11  address that you had made your comments about, Mr. Meyer, was

12  that the original guideline calculation that the parties

13  agreed to at the time of sentencing -- or excuse me -- at the

14  time of the plea -- or not agreed to, there wasn't a plea

15  agreement -- but contemplated I guess would be the right word

16  is the more appropriate starting point.  Just as a technical

17  point, that's not correct.  The appropriate starting point, as

18  the Supreme Court has instructed, including in *Gall*, a case

19  that your submission highlights, the appropriate starting

20  point for all sentencing hearings is the correct and accurate

21  calculation of the guideline range; and in that regard, the

22  PSR reflects the accurate calculation of the guideline range.

23  That doesn't mean, as I've already indicated, that I disagree

24  with your basic argument about giving the same kind of weight

25  to the juvenile convictions or adjudications than we do to

1   quote-unquote adult adjudications is appropriate, but to be

2   clear, the required starting point for the Court's analysis is

3   the applicable advisory guideline range.  And that is the

4   starting point that I use in considering the appropriate

5   sentence to impose.

6          All right.  So we talked about the seriousness of the

7   offense.  The need to promote respect for the law is really

8   part and parcel of the deterrence question, in my view.

9   Again, this process is more complicated than speaking just to

10  Mr. Brown.  The sentence that's imposed in this case has to

11  speak to a larger audience.  It has to speak to all of

12  Mr. Brown's friends who are flashing gang signs and flashing

13  weapons and smoking weed and making rap videos that glorify a

14  culture of violence and illegality.  It has to speak to them.

15  It also has to speak to all the people who are put in danger

16  by guns and gang activity every day because it has to

17  reinforce their confidence in the rule of law and the efficacy

18  of the rule of law, and that's a challenge today.  It seems to

19  become more and more of a challenge every day.  But that

20  doesn't mean we abandon the challenge or we succumb to

21  lawlessness.  We don't celebrate lawlessness.  We send a

22  message, we don't tolerate this conduct.  We're not going to

23  tolerate this conduct.  And that's part of what this message

24  has to be.  It has to speak to the public.  Probably no

25  individual is going to hear what sentence you got in this case

1    and decide, oh, I better put this gun down.  That's not really

2    the issue.  The issue is confidence in the rule of law and

3    what will happen if people lose confidence in the rule of law.

4    And what happens when people lose confidence in the rule of

5    law is we have chaos.  So this sentence has to speak not only

6    to you, but it has to speak to the public, and it has to help

7    piece by piece promote respect for the law, which means

8    promoting respect for the rule of law.

9            I'm required to consider the need to avoid

10   unwarranted sentencing disparities.  The Supreme Court has --

11   as it has said that the sentencing guideline range should be

12   the starting point for the Court's analysis of the factors

13   under Section 3553(a), the Supreme Court has also instructed

14   the best tool available for avoiding disparities among

15   similarly situated defendants is the guideline range because

16   imperfect though the guideline calculations may be, they're

17   based on objective criteria, and they prescribe or recommend

18   equivalent punishments for equivalent conduct and equivalent

19   personal characteristics to the extent they measure them.  So

20   I have to give substantial consideration to the advisory

21   guideline range, and I do give substantial consideration to

22   that range.

23           I have to consider the kinds of sentences available

24   under the law.  This crime could be punished by probation.  It

25   will not be punished by probation.  That would be grossly

1    inadequate to the seriousness of the offense.  There's no

2    mandatory minimum sentence that applies here.  The maximum

3    sentence that can be imposed is ten years.  And, again, the

4    advisory guideline sentence is imprisonment for a term of 30

5    to 37 months.

6         All right.  I think that addresses most of the points

7    that have been made in aggravation or mitigation by the

8    government and by the defense, but, Mr. Meyer, are there any

9    points in mitigation either that you neglected to discuss that

10   you wish to add or any points that you think that I have not

11   addressed adequately in my comments?

12        MR. MEYER:  No, Judge.  There's no additional point

13   in mitigation that I would like to raise.  I would just like

14   to respond to one thing.  I may have chosen my words

15   inartfully before when I suggested that the lower guidelines

16   range was the starting point.  And I understand from the

17   Court's comments that I believe the Court understood what I

18   was trying to say, but just to clarify, we do acknowledge that

19   30 to 37 points is the appropriate starting point under the

20   guidelines.  I think my comments were in recognition of the

21   Supreme Court's case law that says that the guidelines can't

22   be presumed to be reasonable.  And what I probably should have

23   said was that we believe that the lower guidelines range is

24   more appropriate in this case.

25        THE COURT:  Understood.  Thank you.

1          Mr. McCarthy, anything else from the government?

2          MR. McCARTHY:  No, Your Honor.

3          THE COURT:  All right.  Then I'm prepared to impose

4    the sentence in this case.

5          On July 16th of 2020, defendant Kentrell Brown

6    entered a plea of guilty to a charge of unlawful possession of

7    ammunition in violation of Title 18 of the United States Code,

8    Section 922(g).

9          I've considered all the arguments presented to me by

10   the government, by defense counsel.  I've considered

11   Mr. Brown's statements here in court today.  I've also

12   considered the letters that were submitted, both Mr. Brown's

13   letter and the letters submitted by family members and

14   friends.

15         And, actually, before I go further, I did want to

16   make a point to say, Mr. Brown, I read your letter, and I was

17   impressed by your letter.  Your letter, you know, if I was

18   grading on a curve in terms of letters that defendants have

19   submitted to me, you get an A.  That letter is well-written.

20   I mean, there's some mistakes.  There was some misspellings.

21   But it's coherent.  It's logical.  It's well thought out.  And

22   it tells me exactly what Mr. Meyer has told me, you're an

23   intelligent guy.  You could do so much more than this.  And

24   it's just going to be an utter waste if you continue

25   glorifying this culture that's going to keep you behind bars

1    until society is satisfied and you demonstrated that you've

2    outgrown it.  What a tragedy that would be.

3         So I did read your letter, and I was impressed by

4    your letter.  I'm impressed by the support that your family

5    members continue to give you here.  But if they really want to

6    support you, what they need to do is echo what I've been

7    telling you and I bet you Mr. Meyer has been telling you as

8    well, is you've got to turn the page.

9         So I've considered those letters.  I've considered

10   the federal sentencing guidelines.  I've taken into

11   consideration all the factors set forth in Section 3553(a).

12   I've considered the totality of the circumstances in

13   fashioning a sentence for Mr. Brown.

14        The government has requested a sentence within the

15   applicable guideline range of 30 to 37 months.  The defense

16   has asked for a sentence of 18 months of incarceration to be

17   followed with a term of supervised release of three years, the

18   first six months of which would be held in home confinement.

19   The probation office's recommendation is a sentence of

20   imprisonment of 33 months, which is the middle of the

21   guideline range.

22        I am imposing a sentence of 30 months which is the

23   low end of the guideline range.

24        Mr. Brown, I'm sure that's more than you were hoping

25   for.  Mr. Meyer made a very cogent and thorough argument; but

1    for the reasons I've explained, there's more to it than just

2    consideration of what's good and appropriate for you, and I

3    have to take all of those objectives into account.  I want you

4    to understand that the sentence could easily have been higher,

5    in fact, would have been higher than even the guideline range

6    based on what I see on those videos.  The reason I'm imposing

7    a sentence within the guideline range is the very capable and

8    effective advocacy that Mr. Meyer has provided to you and in

9    particular in arguing about your relative youth and how the

10   Court should take that into consideration in assessing overall

11   your culpability and the prospects for your future and how the

12   Court should take that into account in evaluating your past

13   criminal history.  And as I said earlier, I take that into

14   account, and that's why I'm not imposing a sentence above the

15   guideline range but one within the guideline range.

16          And for the same reasons, those same reasons

17   contribute to why I'm imposing the sentence at the low end of

18   that range.  Along with Mr. Meyer's point that the conditions

19   that you've been serving your sentence under -- well, not your

20   sentence but your pretrial custody under during this pandemic

21   have been harsher than normal, have been more punitive than

22   normal.  So I will give you some consideration in that regard

23   as well.  But this is -- as I am required to impose, this is

24   the sentence that is sufficient but not greater than

25   necessary.  I can't agree a sentence less than this, for

1   someone with your record and someone who has thus far

2   demonstrated such disregard for the law, I can't conclude that

3   a lower sentence is appropriate here or will serve all of the

4   objectives that I'm required to consider.

5        Mr. Brown is unlikely to have significant financial

6   resources to pay a fine.  No fine will be imposed.

7        Oh.  The other thing I wanted to say is -- with

8   respect to the defense request is there will be a term of

9   supervised release of three years imposed, but the defense

10  request of -- proposed substitution, if you will, of six

11  months of home confinement is not persuasive to the Court.  I

12  don't find that home confinement would be terribly meaningful

13  in light of the conduct reflected on the video and the absence

14  of any reason to believe that Mr. Brown would be effectively

15  supervised while being confined to his mother's home.  We'll

16  see how Mr. Brown does on supervised release.  There will be a

17  term of supervised release.

18       Mr. Brown, if you violate the terms and conditions of

19  supervised release, you will be right back in front of me.

20  And I'm going to remind you about this conversation, and I'm

21  going to remind you and I'm going to remind Mr. Meyer what

22  he's argued.  And I'm going to ask you, why in the world are

23  we here again?  What didn't you understand about what we did

24  on January 25, 2021?  And there's going to be more custodial

25  time if you commit more crimes.  I don't want that to happen.

1    I want you to turn the page.  I don't want to see the tragedy

2    of your life being spent behind bars.  We're going to give you

3    during the term of supervised release as much help as we can,

4    get you some job training, get you in a treatment program, get

5    you in a GED program if you haven't already gotten a GED by

6    the time you get out.  You would be foolish not to take

7    advantage of every opportunity that's given to you for

8    treatment, for training, for education.  And I think -- I

9    mean, you told me you're already trying to do that.  You

10   enrolled in a parenting class even though you don't have any

11   kids, but you're going to have kids some day because you're

12   going to have a life ahead of you.  So that's great, and

13   that's what you need to continue to do.  And we're going to

14   try to help you.  We're not just going to try to help you.

15   We're going to insist you do it on penalty of going back to

16   jail.  I don't want to be negative about it, but that's what

17   it means.  That's your choice now.  You either get with the

18   program or you stay behind bars.  It's not more complicated

19   than that.

20        Restitution is not an issue in this case.

21        I am required to impose a special assessment of $100

22   on the count of conviction.

23        All right.  With respect to the term of supervised

24   release, that will be three years.  It will be subject to the

25   terms and conditions recommended in the presentence

1    investigation report with the exception of the two conditions

2    that I think Mr. Meyer objected to, which was with respect to

3    discretionary condition 16.  We'll delete the at work location

4    for probation officer's visits, and we'll delete the -- we'll

5    change the language for "at any reasonable time" to add "as

6    agreed in advance or as ordered by the Court."

7            Is that acceptable, Mr. Meyer?

8            MR. MEYER:  Yes, Judge, it is.  Thank you.

9            THE COURT:  All right.  And then I will not impose

10   the search condition, discretionary condition 23, for the

11   reasons set forth in Mr. Meyer's memo.

12           I am going to impose one additional condition because

13   I just had a case that revealed that this is actually not set

14   forth as a condition of supervised release, and that can

15   create some difficulties under certain circumstances.

16           I'm going to add as a condition that Mr. Brown appear

17   as ordered before the Court on any occasion when he is

18   required to be in court during the term of supervised release.

19   That's actually not stated there anywhere, so I'm making that

20   a term of supervised release.

21           All right.  I think those were the only objections

22   you had identified, Mr. Meyer.  Were there any I missed or any

23   others that you're seeking?

24           MR. MEYER:  No, Judge.  That's correct.  Those were

25   the only two objections we had.

1              THE COURT:  Okay.  The Seventh Circuit has indicated

2    that during sentencing, defendants should be advised of

3    their -- of each term of supervised release and the reasons

4    that it is being imposed unless they waive that process, which

5    they may do where the recommended terms and conditions have

6    been made available meaningfully in advance of the sentencing

7    hearing with an opportunity to object.

8              Would you like me to go through all of the terms and

9    conditions of supervised release or does the defense waive

10   that process?

11             MR. MEYER:  We will waive that today, Your Honor.

12             THE COURT:  All right.  All of the terms and

13   conditions of supervised release will be included in the

14   written judgment and commitment order.

15             All right.  Mr. Brown, you have the right to appeal

16   the judgment in this case, including the sentence that I have

17   imposed here today.  Mr. Meyer will continue to advise you

18   with respect to your appellate rights, but you should know

19   that if you wish to appeal, that appeal has to be initiated by

20   the filing of a notice of appeal in the district court for the

21   Northern District of Illinois within 14 days of the entry of

22   the judgment on the docket.

23             Mr. Meyer, the judgment will likely be entered on the

24   docket tomorrow, so that will start the 14-day clock.

25             Is the defense seeking any recommendations to the

1    Bureau of Prisons?

2           MR. MEYER:  We are, Judge, one recommendation and one

3    additional request.

4           As far as a recommendation for placement, just as

5    near as practicable to Chicago to facilitate family visits.

6           THE COURT:  All right.

7           MR. MEYER:  And the other request is to waive the

8    costs of incarceration and supervision based on an inability

9    to pay.

10          THE COURT:  All right.  I will recommend to the

11   Bureau of Prisons that Mr. Brown be designated to a facility

12   as close to Chicago as possible.

13          Mr. Brown, you should understand I don't have the

14   authority to tell the Bureau of Prisons where they have you

15   serve the rest of your sentence.  All I can do is make a

16   recommendation, and I'm happy to make that recommendation.

17          And I will grant the request to waive the costs of

18   incarceration.

19          All right.  Ms. Fowlie, anything I neglected to cover

20   from probation's perspective?

21          PROBATION OFFICER:  No, Your Honor.  I believe you

22   covered everything.

23          THE COURT:  Mr. McCarthy, anything else from the

24   United States?

25          MR. McCARTHY:  No, Your Honor.

41

1          THE COURT:  All right.  Mr. Brown is in custody.  He

2     will be remanded to the custody of the marshal and under

3     marshal's custody be transported to the designated facility.

4          If there's nothing else, I think we're adjourned.

5          Mr. Brown, I wish you good luck in the future.  I

6     don't want to see you back in my courtroom because that's

7     going to mean we've got a problem, all right.  So good luck to

8     you.  Take advantage of the opportunities you've been given.

9          All right.  We're adjourned.  Thank you.

10          MR. MEYER:  Thank you.

11          MR. McCARTHY:  Thank you.

12     (Which were all of the proceedings heard.)

13

14               C E R T I F I C A T E

15          I certify that the foregoing is a correct transcript,

16     to the extent possible, of the record of proceedings in the

17     above-entitled matter given the limitations of conducting

18     proceedings via videoconference.

19

20     */s/ KELLY M. FITZGERALD*                    *April 5, 2021*
       KELLY M. FITZGERALD, CSR, RMR, CRR
21     Official Court Reporter

22

23

24

25